# IVANHOE IRRIGATION DISTRICT et al. *v.* McCRACKEN et al.

No. 122.   Argued April 29, 1958.—Decided June 23, 1958.*

---

*Together with No. 123, *Madera Irrigation District et al.* v. *Steiner et al.*, No. 124, *Madera Irrigation District* v. *Albonico et ux.*, and No. 125, *Santa Barbara County Water Agency* v. *Balaam et al.*, also on appeals from the same Court.

B. *Abbott Goldberg,* Deputy Attorney General of California, argued the causes for appellants. On the brief were *Edmund G. Brown,* Attorney General, *Mr. Goldberg* and *Adolphus Moskovitz,* Deputy Attorney General, for the State of California and the Ivanhoe Irrigation District, *Denver C. Peckinpah* for the Madera Irrigation District, and *Francis Price* for the Santa Barbara County Water Agency, appellants.

By special leave of Court, 356 U. S. 917, *John F. Davis* argued the causes for the United States, as *amicus curiae,*

urging reversal. On the brief were *Solicitor General Rankin, Assistant Attorney General Morton, Roger P. Marquis, S. Billingsley Hill, Fred W. Smith* and *David R. Warner.*

*Harry W. Horton, Alvin J. Rockwell* and *Denslow B. Green* argued the causes for appellees. With them on the brief were *Reginald L. Knox, Jr., W. R. Bailey, Sherman Anderson* and *Herman Phleger.*

Briefs of *amici curiae* urging affirmance were filed by the Irrigation Districts Association of California, and *Edson Abel* and *Allen Lauterbach* for the American Farm Bureau Federation and the California Farm Bureau Federation.

MR. JUSTICE CLARK delivered the opinion of the Court.

These four cases present issues of basic importance to the federal reclamation laws. The Supreme Court of California has refused to confirm certain contracts entered into between two state irrigation districts and a water agency on the one hand and the United States on the other,[1] finding the contracts invalid on several grounds. 47 Cal. 2d 597, 681, 695, 699, 306 P. 2d 824, 886, 894, 875. Specifically involved are parts of two statutory enactments: Section 5 of the Reclamation Act of 1902,[2] pro-

---

[1] Section 46 of the Omnibus Adjustment Act of 1926 requires that the contracts be confirmed by decree of a court of competent jurisdiction. 44 Stat. 649, as amended, 70 Stat. 524, 43 U. S. C. § 423e. For the applicable California statutes authorizing such procedure, see Cal. Water Code, 1956, § 23225 (irrigation districts), and Cal. Stat. 1945, pp. 2780, 2798, as amended, Cal. Stat. 1949, p. 18 (water agency).

[2] Section 5: ". . . No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no

viding generally that no right to the use of water shall be sold for lands in excess of 160 acres in single ownership, and § 9 of the Reclamation Project Act of 1939,[3] providing, *inter alia*, for the repayment to the United States of funds expended on the construction of reclamation works, and authorizing the Secretary of the Interior to make contracts to furnish reclamation water at appropriate rates for irrigation. The opinion of the Supreme Court of California turned on an interpretation of a third provision, § 8 of the Reclamation Act of 1902.[4]

such right shall permanently attach until all payments therefor are made." 32 Stat. 389, 43 U. S. C. § 431. This provision was substantially re-enacted in § 46 of the Omnibus Adjustment Act of 1926, 44 Stat. 649, as amended, 70 Stat. 524, 43 U. S. C. § 423e.

[3] 53 Stat. 1193, as amended, 59 Stat. 75, 43 U. S. C. § 485h. Section 9 (c), the pertinent section in No. 125, authorizes the Secretary of the Interior to enter into contracts to furnish water for municipal water supply. Section 9 (d) involves contracts with irrigation districts, and requires repayment within a 40-year period of construction costs allocated to irrigation. Section 9 (e) authorizes the use of an alternative method of repayment, whereby the Secretary may agree to furnish water for irrigation for a period of 40 years at rates sufficient "to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation . . . . [T]he costs of any irrigation water distribution works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project, shall be covered by a repayment contract entered into pursuant to said subsection (d)."

[4] Section 8: "That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user

That section provides that the Act is not to be construed as interfering with state laws "relating to the control, appropriation, use, or distribution of water used in irrigation." It further provides that in administering the Act the Secretary of the Interior "shall proceed in conformity with such laws . . . ." The California court held that this provision required the application of California law, and finding the provisions of the contracts contrary thereto, it refused confirmation. The water districts and agency involved, joined by the State of California, appealed, and we postponed the question of jurisdiction to the merits. 355 U. S. 803 (1957). We have concluded, for reasons hereinafter set forth, that we have no jurisdiction over the appeals. Treating the papers as petitions for certiorari, 28 U. S. C. § 2103, we grant certiorari. On the merits, we deem the contracts controlled by federal law and valid as against the objections made.

## I. THE BACKGROUND OF THE LITIGATION.

This litigation involves a dispute between landowners on the one hand and the combined State and Federal Governments on the other. As the Attorney General of California points out, there is no clash here between the United States and the State of California. Quite to the contrary, the United States and the various state agencies, with commendable faith and steadfastness to one another, have embarked upon and nearly completed a most complicated joint venture known as the Central Valley Project. There have at times been differences, but these are inevitable in the everyday implementation of

of water in, to, or from any interstate stream or the waters thereof: *Provided,* That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." 32 Stat. 390, 43 U. S. C. §§ 372, 383.

such a giant undertaking. On the whole the parties have kept the ultimate goal firmly centered in their joint vision.

Central Valley is the largest single undertaking yet embarked upon under the federal reclamation program. It was born in the minds of far-seeing Californians in their endeavor to bring to that State's parched acres a water supply sufficiently permanent to transform them into veritable gardens for the benefit of mankind. Failing in its efforts to finance such a giant undertaking, California almost a quarter of a century ago petitioned the United States to join in the enterprise. The Congress approved and adopted the project, pursuant to repeated requests of the State, and thus far has expended nearly half a billion dollars. The total cost is estimated to be as high as a billion dollars.

The saga of this project is fascinating. California has two somewhat parallel ranges of mountains running south from its northern border for two-thirds the length of the State. Known as the Sierra Nevada on the east and the Coast Range on the west, they converge on the north at Mount Shasta and are joined by the Tehachapi Mountains on the south, thereby forming the Central Valley Basin. The basin extends almost 500 miles between these ranges, from Shasta to Bakersfield, and has an average width of 120 miles, including more than a third of the area of California. The main valley floor, comprising about a third of the basin area, is an alluvial plain some 400 miles long and averaging 45 miles in width. The Sacramento River, with headwaters near Mount Shasta, flows south into San Francisco Bay, draining the northern portion of the basin. The San Joaquin River, which rises above Friant in the south, runs first west then north to join the Sacramento River in the Sacramento-San Joaquin Delta, both finding a common outlet to the ocean

through San Francisco Bay. See *United States* v. *Gerlach Live Stock Co.*, 339 U. S. 725 (1950).

Rainfall on the valley floor comes during the winter months—85% from November to April—and summers are quite dry. At Red Bluff, just south of Mount Shasta, the average is 23 inches, while south at Bakersfield a scant 6 inches fall. The climate is ideal with a frost-free period of over seven months and a mild winter permitting production of some citrus as well as deciduous fruits and other specialized crops. The absence of rain, however, makes irrigation essential, particularly in the southern region.

In the mountain ranges precipitation is greater, and the winters more severe. The Northern Sierras average 80 inches of rainfall and the Southern 35 inches. The Coast Range experiences much less. In the higher recesses of the mountains precipitation is largely snow which, when it melts, joins the other runoff of the mountain areas to make up an annual average of 33,000,000 acre-feet of water coming from the mountain regions. Nature has not regulated the timing of the runoff water, however, and it is estimated that half of the Sierra runoff occurs during the three months of April, May, and June. Resulting floods cause great damage, and waste this phenomenal accumulation of water so vital to the valley's rich alluvial soil. The object of the plan is to arrest this flow and regulate its seasonal and year-to-year variations, thereby creating salinity control to avoid the gradual encroachment of ocean water, providing an adequate supply of water for municipal and irrigation purposes, facilitating navigation, and generating power. The plan is now nearing completion and is actually in partial operation in some areas.

The completed project is built around these two great rivers, and includes a series of dams, three of which—

Shasta, Folsom, and Trinity River—will furnish electric power. The state water plan contemplates that eventually 38 major reservoirs scattered at various points in this part of the State will store an estimated 30,000,000 acre-feet of water. The Shasta Dam and Reservoir sits at the head of the table on the north. With a capacity of 4,500,000 acre-feet of water, it, along with tributary dams and reservoirs, will control the floods from that area. The Trinity River, with headwaters west of Shasta on the western slope of the Coast Range, drains into the Pacific Ocean. A dam now under construction near Lewiston will impound some three-quarters of a million acre-feet of water which, by means of a tunnel, will be partially diverted into and supplement the waters of the Sacramento River lying to the east and across the mountains. The water supply facilities along the Sacramento River will regulate its flow, store surplus winter runoff for use in the Sacramento Valley, maintain navigation in the channel, protect the Sacramento-San Joaquin Delta from salt intrusion from the Pacific, provide a water supply for the Contra Costa and Delta-Mendota Canals, and generate a great deal of hydroelectric energy. The Contra Costa Canal services the south shore of Suisun Bay from Antioch to Martinez with water from the Delta for domestic, industrial, and irrigation use. The Delta-Mendota Canal transports surplus Sacramento River water to Mendota Pool on the San Joaquin River, 120 miles south of the Delta. The water is pumped from the Delta to the canal along the foothills of the Coast Range and by gravity it runs to the pool at Mendota. This exchange of water replaces that diverted from the San Joaquin by the dam at Friant. This latter dam forces the entire flow of the San Joaquin into Millerton Lake which has a capacity of 520,000 acre-feet of water. It is diverted from the lake by the Madera Canal to

the north and the Friant-Kern Canal to the south. The former extends about 37 miles in length and services the Madera District, while the latter supplies water to the Ivanhoe District and others to the south. It will extend south about 160 miles to a point near Bakersfield, which sits at the foot of the Central Valley's enormous table.

The power facilities of the project will, when finally completed, have a capacity of near a million kilowatts. Transmission lines, steam plants, and other essential facilities will be constructed so as to obtain the maximum utilization. It is estimated that through the sale of this power the United States will receive reimbursement for over half of its total reimbursable expenditures.

The over-all allocation of these enormous costs has not been definitely determined. That portion of the costs ultimately allocated to power facilities will be reimbursed at 4% interest, but that allocated to irrigation facilities will be reimbursed at *no* interest. Moreover, the Federal Government will receive no reimbursement for that portion of the cost allocated to numerous aspects of the project, such as navigation, flood control, salinity prevention, fish and wildlife preservation, and recreation. The irrigators will, therefore, be chargeable with but a small fraction of the total cost of the project.

We hasten to correct any impression that lands in the Central Valley had not been reclaimed and irrigated at the inception of the project. On the contrary, since California entered the Union it has worked diligently to bring water to its arid lands. Working largely through state irrigation districts, private interests have been ingenious in constructing smaller reservoirs, tapping underground sources, and attempting to prevent saline encroachment which would destroy the soil for agricultural purposes. Water has been called "the life blood of the State." Competition for this vital natural resource has provoked such

controversy that it has required amendments to the Constitution and continual legislative activity. It is not at all surprising, therefore, that in putting together the mosaic of Central Valley some litigation would ensue. See *United States* v. *Gerlach Live Stock Co., supra.*

## II. Scope of the Appeals and Nature of the Contracts.

These four appeals contest the right of the United States and California to complete the venture and reap the rewards therefrom as provided by their respective laws.

It should be noted that the appeal involving the Santa Barbara County Water Agency, No. 125, does not involve the Central Valley Project, as it does not lie within that area. It concerns a project to supply water for irrigation and municipal uses along the south coastal area of Santa Barbara County. It includes a dam on the Santa Ynez River impounding water in Cachuma Reservoir. This river rises on the western slopes of the Coast Range and runs into the Pacific. The Tecolote Tunnel will deliver water across the coastal range of mountains to the Santa Barbara County Agency through the lateral distribution systems of the Goleta and Carpenteria County Water Districts. The adoption of the project by the Congress in 1948 was based on the recommendation of the State Division of Water Resources Report stating that there was "an urgent and immediate need for substantial supplemental municipal and irrigation water supplies . . . . The city of Santa Barbara has a critical water situation at this time. . . . The underground water supplies in the county water districts are being seriously overdrawn. In some localities . . . wells are being damaged by salt water intrusion." H. R. Doc. No. 587, 80th Cong., 2d Sess. 10. While the contract is authorized

under § 9 (c) of the 1939 Act,[5] for our purposes it is identical to the others and will be discussed with them.

The remaining appeals involve areas in the southern portion of the Central Valley Basin. The Madera District includes the Friant Dam and Millerton Lake, the sites for which the United States has purchased outright. Water rights surrounding these areas were involved in *United States* v. *Gerlach Live Stock Co., supra,* and have been acquired by the United States. These installations are, of course, vital to the operation of the project in the south of the valley. The Madera District will be furnished water from Millerton Lake by the Madera Canal. The Ivanhoe District is south of Friant and will be supplied water through the Friant-Kern Canal. It is interesting to note that irrigators in this district receive water diverted from the San Joaquin in which they never had nor were able to obtain any water right.

The contracts to which the Supreme Court of California took exception provide, in outline, that the United States will, after construction of the water supply facilities and the lateral distribution system for the irrigation districts, furnish water to the districts and the Santa Barbara County Agency for a period of 40 years. Incorporating the requirements of § 5 of the Reclamation Act of 1902,[6] the contract provides that project water shall not be furnished to lands in excess of 160 acres in single ownership. This limitation applies only to "project water" and previously existing water supplies are unaffected thereby. "Large landowners," *i. e.,* those who own excess land, who wish that excess to have the benefit of project water must agree to sell their excess to other than large landowners within 10 years at a price, fixed by three

---

[5] See note 3, *supra.*

[6] See note 2, *supra.*

appraisers, which will exclude potential enhancement of the price by reason of project water being available. Large landowners electing not to sell their excess may use existing water supplies in underground sources. Moreover, if they designate which of their holdings shall be considered nonexcess, the district would furnish water to that land under the terms provided in the contracts.

The repayment provisions as to the "distribution systems" require liquidation of the maximum stated expenditure of the United States by installments spread over 40 years, without interest, in accordance with § 9 (d) of the Reclamation Project Act of 1939. As to the "water supply facilities," such as the dams and reservoirs, the contracts employ the more liberal provisions of § 9 (e) of that Act.[7] Repayment, without interest, is to be included in the charge for water sold to the districts and the agency by the United States. The contract term runs for 40 years and, using the language of § 9 (e), the water rate is calculated so as to return to the United States "revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation." The Congress has now supplemented these terms of the contracts by the Act of July 2, 1956, 70 Stat. 483. It provides that the districts and the agency shall be given "credit each year" for "so much of the amount paid . . . as is in excess of the share of the operation and maintenance costs of the project which the Secretary finds is properly chargeable . . . ." The provision is retroactive and runs with the contract, and when this amount is equal to the amount

---

[7] See note 3, *supra.*

owing on the total water supply expenditures allocated to irrigation, "no construction component shall be included in any charges made for the furnishing of water . . . ." The Act also permits renewal of the contract on terms that will reflect any "increases or decreases in construction, operation, and maintenance costs and improvement or deterioration in the [district's] repayment capacity." In addition, the Act provides that the districts and the agency "shall . . . have a first right (to which right the rights of the holders of any other type of irrigation water contract shall be subordinate) to a stated share or quantity of the project's available water supply for beneficial use on the irrigable lands [within the district] and a permanent right to such share or quantity upon completion of payment of the amount" that is due on expenditures for water supply allocated to irrigation.

### III. Action of the California Courts.

In the confirmation suits involving the Ivanhoe District, No. 122, and of the Madera District, No. 123, the trial court found the contracts and the proceedings leading to their execution invalid. The court reasoned that § 8 of the 1902 Act required that "whenever there is a conflict between the Federal Reclamation laws and the laws of the State, the law of California must prevail." The court also found that in the light of the origin of the Central Valley Project, the United States was trustee of an express trust of which the Ivanhoe District and others were among the beneficiaries. It concluded that all applications to appropriate water are included in such trust and the beneficiaries have "an incomplete, incipient and conditional right in the water applied for" which is vested and runs with the land. The excess land provision was declared invalid and unenforceable as conflicting

with both state law and the Reclamation Act.    Application of the excess land provision to an irrigator would, the court found, be unconstitutional.

The *Albonico* litigation, No. 124, was an application for a mandatory order excluding lands in excess of 320 acres owned by the Albonicos from the Madera District. The court held that the excess land provisions were unconstitutional and that if applied to the Albonicos the mandatory order should issue.

The trial court in the *Santa Barbara* confirmation case, No. 125, contrary to the action in the other cases, upheld the contract and granted confirmation.    The court found that the Master Contract was ratified and confirmed by the Interior Department's Appropriation Act for 1951. 64 Stat. 595, 679.

The Supreme Court of California, by a 4–3 vote, reversed the trial court judgment validating the contract in No. 125, the *Santa Barbara* case, and affirmed each of the other judgments.    The principal opinion was in the *Ivanhoe* case to which we confine our discussion.    The majority agreed with the trial court that § 8 of the 1902 Act required the application of state law.    It found that the excess lands provision was inapplicable and improper under state law, and that the contract was therefore invalid.    This conclusion was posited on a trust theory of California water law which placed a trust on the State and the irrigation districts for the benefit of water users. In administering this trust the United States, the majority held, stood in the shoes of the State.    The § 9 (e) provisions of the contract were found invalid on the grounds that no provision was made for repayment of a stated amount within 40 years or for transfer of title to the distribution systems to the respective districts after payment thereof, and that no permanent right to receive water was vested in the respective districts and their

members. The court appears to have reached this conclusion by finding that the contract created a "debtor-creditor" relationship and that the United States was acting as a public utility without conforming to state law.

## IV. The Jurisdictional Question.

We first face the dual aspects of the jurisdictional question: has California's Supreme Court held a federal statute unconstitutional, and does its decision rest on an adequate state ground? *Flournoy* v. *Wiener,* 321 U. S. 253, 262 (1944).

As we read the reasons, heretofore mentioned, upon which the Supreme Court of California invalidated the contracts, we conclude that they rest upon neither ground. As to the rights and duties of the United States under the contracts, these are matters of federal law on which this Court has final word. *Clearfield Trust Co.* v. *United States,* 318 U. S. 363 (1943). Our construction of the contract might dispel any features thereof found offensive. The other ground, namely, the 160-acre limitation, alone requires further consideration.

Appellants claim that California's Supreme Court has held unconstitutional the federal statutes, § 5 of the Reclamation Act of 1902, as re-enacted in § 46 of the Omnibus Adjustment Act of 1926, relating to the 160-acre limitation. It appears to us, however, that the opinion actually turned on the court's interpretation of § 8 of the 1902 Act. In effect, the court held that this section overrides all other sections of the Act, requiring that it be construed as not affecting state laws "relating to the control, appropriation, use, or distribution of water used in irrigation." Turning to state law, the court by applying a "trust theory" held that the Federal Government could acquire no title to appropriative water rights free of a trust in the State of California for the benefit

of the people of the State. This "limited measure of control" of the appropriative water, the court said, 47 Cal. 2d, at 620, 306 P. 2d, at 837, prevented the imposition of the 160-acre limitation because the beneficiaries of the trust, namely, the people of the State and particularly those in the districts involved, would be deprived by the acreage limitation of a right to the use of the water in the district. We think it plain that this was a construction of federal law and not a holding of unconstitutionality. This, of course, provides no basis for an appeal, but the importance of the case, as we earlier noted, requires that certiorari be granted.

We deem it equally clear that the judgments do not rest on an adequate state ground. The construction the opinion gave to § 8 of the 1902 Act nullified the specific mandate of § 5, as well as its re-enactment in the 1926 Act, and even though in the doing a state law may have been called into play, this would not immunize it from this Court's review. Basically it is the interpretation of the Federal Act that opens the door to the application of the state law and leads to the striking down of the contracts made by the Secretary.

Nor would the suggestion that state law prevented the water districts and agencies of the State from entering into the contracts change this conclusion. We need not determine whether a State could in that manner frustrate the consummation of a federal project constructed at its own behest. The fact remains that the state law was, in fact, invoked only by the interpretation the court gave § 8.

### V. APPLICATION OF THE RECLAMATION LAWS TO THE CONTRACTS.

At the outset we set aside as not necessary to decision here the question of title to or vested rights in unappropriated water. Cf. *Nebraska* v. *Wyoming*, 325 U. S. 589,

611–616 (1945). If the rights held by the United States are insufficient, then it must acquire those necessary to carry on the project, *United States* v. *Gerlach Live Stock Co., supra,* at 739, paying just compensation therefor, either through condemnation or, if already taken, through action of the owners in the courts. As we see it, the authority to impose the conditions of the contracts here comes from the power of the Congress to condition the use of federal funds, works, and projects on compliance with reasonable requirements. And, again, if the enforcement of those conditions impairs any compensable property rights, then recourse for just compensation is open in the courts.

As we have noted, the Supreme Court of California first concluded that the provisions of § 8 of the 1902 Act as to the application of state law were absolute, and controlled all provisions of the Act and other reclamation statutes having to do with "the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder . . . ." We believe this erroneous insofar as the substantive provisions of § 5 of the 1902 Act are concerned. As we read § 8, it merely requires the United States to comply with state law when, in the construction and operation of a reclamation project, it becomes necessary for it to acquire water rights or vested interests therein. But the acquisition of water rights must not be confused with the operation of federal projects. As the Court said in *Nebraska* v. *Wyoming, supra,* at 615: "We do not suggest that where Congress has provided a system of regulation for federal projects it must give way before an inconsistent state system." Section 5 is a specific and mandatory prerequisite laid down by the Congress as binding in the operation of reclamation projects, providing that "[n]o right to the use of water . . . shall be sold for a tract exceeding one hundred and sixty acres to any one landowner . . . ."

We read nothing in § 8 that compels the United States to deliver water on conditions imposed by the State. To read § 8 to the contrary would require the Secretary to violate § 5, the provisions of which, as we shall see, have been national policy for over half a century. Without passing generally on the coverage of § 8 in the delicate area of federal-state relations in the irrigation field, we do not believe that the Congress intended § 8 to override the repeatedly reaffirmed national policy of § 5.

From the beginning of the federal reclamation program in 1902, the policy as declared by the Congress has been one requiring that the benefits therefrom be made available to the largest number of people, consistent, of course, with the public good. This policy has been accomplished by limiting the quantity of land in a single ownership to which project water might be supplied. It has been applied to public land opened up for entry under the reclamation law as well as privately owned lands, which might receive project water. See Taylor, The Excess Land Law: Execution of a Public Policy, 64 Yale L. J. 477.

Significantly, where a particular project has been exempted because of its peculiar circumstances, the Congress has always made such exemption by express enactment. See Act of September 3, 1954, 68 Stat. 1190, exempting the Santa Maria Project from the applicability of "excess land laws." [8]  With respect to the Central Valley Project the Congress has again and again reaffirmed the specific requirements of § 5 and the action taken by

---

[8] The Act recites: "That in view of the special circumstances of the Santa Maria project" the excess land laws should not be applicable thereto "so long as the water utilized on project lands is acquired by pumping from the underground reservoir." See H. R. Rep. No. 1098, 83d Cong., 2d Sess. 2–3.

the Secretary thereunder. As late as 1944 on consideration of the Omnibus Rivers and Harbors Bill the Senate refused, after vigorous debate, to concur in a conference report that would have exempted this project from the excess land requirements of § 5. 90 Cong Rec. 9493–9499. At the next Session of the Congress the disputed exemption was deleted from the bill and it was promptly passed. Likewise, the Secretary reported to the Congress from time to time the execution of contracts, similar to those involved here, wherein "the excess land limitations and other requirements of law are fully incorporated in the Central Valley contract form." His annual report for 1950 and 1951 related the execution of the Madera, Ivanhoe, and Santa Barbara contracts involved here. In the latter report he mentions individual contracts with water users under the excess land laws, advising that these laws were "given active attention. Five recordable contracts providing for delivery of Central Valley Project water to 3,570 acres of excess land are the first to be executed on the project." During this period the Congress reauthorized the project, additional units were added, see Act of October 14, 1949, 63 Stat. 852; H. R. Doc. No. 416, 84th Cong., 2d Sess., pp. 620–622; Act of September 26, 1950, 64 Stat. 1036, and the Act of August 12, 1955, 69 Stat. 719; H. R. Doc. No. 416, pp. 937–940, and large appropriations of funds thereto were granted annually.

In light of these congressional actions, it cannot be said that Congress intended that § 8 would, under the application of state law, make inapplicable the excess lands provisions of § 5 of the Reclamation Act of 1902 to the Central Valley Project. That possibility is foreclosed by subsequent and continuing action by the Congress ever since the inception of the project. Such a record constitutes ratification of administrative construction, and confirmation and approval of the contracts.

294

*Fleming* v. *Mohawk Co.,* 331 U. S. 111, 119 (1947); *Brooks* v. *Dewar,* 313 U. S. 354, 361 (1941); *Swayne & Hoyt, Ltd.,* v. *United States,* 300 U. S. 297, 302 (1937).

## VI. The Constitutional Issues.

Appellees urge, however, that the federal statutes requiring insertion of these provisions in the contracts are unconstitutional as a denial of due process and equal protection of the law under the Fifth and Fourteenth Amendments. They assert that the excess acreage provisions amount to a taking of vested property rights both in land and irrigation district water, and discriminate between the nonexcess and the excess landowner. We cannot agree.

There can be no doubt of the Federal Government's general authority to establish and execute the Central Valley and Santa Barbara County projects. As we said in *United States* v. *Gerlach Live Stock Co., supra,* at 739, the Congress "elected to treat it [the Central Valley Project] as a reclamation project." We upheld its power to pursue the project as "clear" and "ample," an exercise of the general power "to promote the general welfare through large-scale projects for reclamation, irrigation, or other internal improvement." *Id.,* at 738. The Santa Barbara Project is supportable on the same grounds. Cf. *United States* v. *Butler,* 297 U. S. 1, 65–67 (1936). In developing these projects the United States is expending federal funds and acquiring federal property for a valid public and national purpose, the promotion of agriculture. This power flows not only from the General Welfare Clause of Art. I, § 8, of the Constitution, but also from Art. IV, § 3, relating to the management and disposal of federal property. As this Court said in *United States* v. *San Francisco,* 310 U. S. 16, 29–30 (1940), this "power over the public land thus entrusted

to Congress is without limitations. 'And it is not for the courts to say how that trust shall be administered. That is for Congress to determine.' " See also *United States* v. *California,* 332 U. S. 19, 27 (1947), and *Alabama* v. *Texas,* 347 U. S. 272, 273–274 (1954).

Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges. See *Berman* v. *Parker,* 348 U. S. 26 (1954), and *Federal Power Comm'n* v. *Idaho Power Co.,* 344 U. S. 17 (1952). The lesson of these cases is that the Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the over-all objectives thereof. Conversely, a State cannot compel use of federal property on terms other than those prescribed or authorized by Congress. *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534 (1958). Article VI of the Constitution, of course, forbids state encroachment on the supremacy of federal legislative action.

In considering appellees' specific constitutional contentions, it is well to recapitulate. The Central Valley Project is multi-purpose in nature. That portion of the project expense attributable to navigation, flood control, salinity prevention, recreation and fish and wildlife preservation is nonreimbursable. The remainder of the total expense, and the only part that is reimbursable, is divided between two main sources. The first is hydroelectric power which estimates indicate will be chargeable with over 50 percent of the reimbursable expense, plus interest on the part representing electric plants in service. The other is irrigation, which pays the rest without interest charge. In short, the project is a subsidy, the cost of which will never be recovered in full. Appellees argue that the same reasoning applies to power facilities, but

there the Government is operating the generating facilities itself and the base rate upon which the power is sold includes an item for interest on the amount of expenditures allocated to that purpose. Hence the true relationship of debtor-creditor is maintained. In the light of these facts we believe that the language of the Court in *Wickard* v. *Filburn*, 317 U. S. 111, 131 (1942), is apposite: "It is hardly lack of due process for the Government to regulate that which it subsidizes."

In any event, the provisions under attack are entirely reasonable and do not deprive appellees of any rights to property or water. It is beyond dispute that excess land will be benefited by delivery of water to neighboring and nearby nonexcess land. This fact was recognized by the California Supreme Court in the *Santa Barbara* case. 47 Cal. 2d 699, 712, 306 P. 2d 875, 883. Furthermore the Chief Engineer of the Madera District so testified before the Senate Committee on Public Lands in 1944.[9] The contracts themselves indirectly refer to the benefits that may accrue, through underground water improvement, to excess owners, by provisions which declare that such water shall not be considered as furnished by the project. In other words, any benefits to the underground water level under excess acreage will not be chargeable to the owner of such acreage, but still will be available to his excess land. We therefore find no substance in the contention that "possible severance" of the excess acreage will result in damage constituting a taking of property

---

[9] "There appears to be no doubt, therefore, that with the introduction of surface irrigation and the consequent cessation of pumping by those using surface water, excess lands will receive direct benefits in the way of a higher water table, with consequent improvement in quality, plus lower pumping costs, and above all, reasonable assurance that the water table will not fall to the danger point." Hearings before Senate Committee on Public Lands on S. 912, 80th Cong., 1st Sess. 1221.

without just compensation. We deem it unnecessary to discuss other claims in this area, but repeat in connection therewith that if the United States takes any compensable water or property right the courts are open for redress.

As to the claim of discrimination in the 160-acre limitation, we believe that it overlooks the purpose for which the project was designed. The project was designed to benefit people, not land. It is a reasonable classification to limit the amount of project water available to each individual in order that benefits may be distributed in accordance with the greatest good to the greatest number of individuals. The limitation insures that this enormous expenditure will not go in disproportionate share to a few individuals with large land holdings. Moreover, it prevents the use of the federal reclamation service for speculative purposes. In short, the excess acreage provision acts as a ceiling, imposed equally upon all participants, on the federal subsidy that is being bestowed.

We also find the other contract provisions reasonable and necessary. As we have pointed out heretofore the Act of July 2, 1956, *supra,* answered most of the objections lodged against these requirements. That Act requires the Secretary, in all § 9 (d) and § 9 (e) contracts executed after its passage, (1) to include a renewal provision, (2) to provide that during the term of the contract or any renewal thereof the contracting parties shall have "first right . . . to a stated share or quantity of the project's available water supply," and (3) to determine as soon as feasible the total repayment obligation of the contracting parties, crediting against that obligation so much of the amount paid for water supply as is unnecessary for operation and maintenance costs until, and only until, that obligation has been liquidated. The Secretary is authorized to negotiate amendments to existing contracts to incorporate the foregoing amendments.

In view of the declarations and privileges incorporated in these amendments we see no room for objection to the contracts on the ground that they infer that the water users are not entitled to water rights beyond the 40-year terms of the contracts, or that they do not make clear that the districts and landowners become free of indebtedness upon repayment.

That leaves two other objections, the first being the failure of the contracts to recite a definite sum as being the total amount due for the water supply facilities. It was not possible at the time of executing the contracts, nor is it today, to determine the exact amount of expenditures necessary for dams and reservoirs. The record shows that original estimates often bore little resemblance to ultimate cost. The project is only two-thirds completed, and estimates of the remaining third cannot be accurately made. Moreover, the Government was not bound to determine in advance of the project's completion just what proportion of this total cost should be attributed to irrigation. In view of these uncertainties it would have been highly impractical, if not impossible, to recite any stated amount in the contract. Since no interest is charged on the amount due, it is difficult to see how harm or inconvenience is occasioned by the delay. The law now requires that all amounts paid the Government in excess of its maintenance and operation costs be credited on the obligations of the respective districts. That is an entirely adequate protection of the district's interest in not paying more than its share of the principal facilities.

Second, objection was made to the absence of any provision to the effect that the districts would obtain title to the distribution systems when their obligations therefor had been totally discharged. We do not understand appellees to contend that the districts and landowners should ultimately obtain title to the principal dams and

reservoirs. The fact that irrigation interests are bearing but a small fraction of the cost of the water supply facilities renders such a suggestion untenable. For related reasons we see no defect in the failure to guarantee passage of title to the local distributing systems at the end of 40 years when it is contemplated that the obligation therefor shall have been discharged. As we have pointed out, even the terms regarding the distribution systems involve a substantial federal subsidy because no interest is charged over the 40-year period during which the principal amount is repaid. In reality, the districts will *never* repay the total cost of these systems. Moreover, it is likely that for some time beyond the 40-year period of these contracts the districts will remain indebted to the Federal Government for their share of the cost of the water supply facilities. Under such circumstances the retention of title to the distribution systems, at least until the stated obligations of the districts are discharged, seems entirely consistent with what the state court thought was a "debtor-creditor" relationship. In view of these considerations, we think it altogether reasonable for the Federal Government and the districts and agency involved to defer the question of title passage to another day.

Any suggestion that the Congress might be arbitrary in the final accounting, or trample upon any of the rights of appellees, is highly improbable. It does not seem untoward for the recipients of a huge federal bounty to have to depend in small measure on the continued beneficence of their donor. It would be a physical impossibility to withdraw the facilities. As for the possibility of discrimination in the administration of those facilities, it seems farfetched to foresee the Federal Government "turning its back upon a people who had been benefited by it" and allowing their lands to revert to

desert.[10]   The prospect is too improbable to figure in our decision.

For the reasons set forth above, the judgments of the Supreme Court of California are

*Reversed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

.

---

[10] Senator Gore (then Representative) gave this compelling answer to these trepidations in 1947:

"I cannot conceive of a Government that would spend $384,000,000 building one of the great reclamation-irrigation projects of the world and suddenly because some evil agent of Government had gotten into a bureau, turning its back upon a people who had been benefited by it and who in turn had greatly benefited the Nation by production of foodstuffs and wealth.   I just do not conceive of the United States as being that kind. . . ."   Hearings before the Subcommittee of the House Committee on Appropriations on the Interior Department Appropriation Bill for 1948, 80th Cong., 1st Sess. 737.