**UNITED FAMILY FARMERS, INC., etc., et al., Appellants,**

v.

**Thomas S. KLEPPE, etc., et al., Appellees.**

**No. 76–1532.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1977.

Decided April 7, 1977.

Martin Weeks, John H. Davidson, Jr., Vermillion, S. D., for appellants; Bogue, Weeks & Rusch, Vermillion, S. D., on brief.

Martin Green, Atty., Dept. of Justice, Washington, D. C., for appellee; Peter R. Taft, Asst. Atty. Gen., Washington, D. C., William F. Clayton, U. S. Atty., and Robert D. Hiaring, Asst. U. S. Atty., Sioux Falls, S. D., Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., on brief.

---

Before LAY and ROSS, Circuit Judges, and WANGELIN,* District Judge.

LAY, Circuit Judge.

United Family Farmers, Inc. (UFF), a nonprofit corporation organized under the laws of South Dakota, and individual farmers sought injunctive relief against the Secretary of the Interior to halt construction of the initial stage of a reclamation project known as the Oahe Diversion Unit of the Missouri River Basin Project.[1] UFF is composed of approximately 900 members, the majority of whom either reside or own land in Spink and Brown counties in South Dakota. The initial stage of the project is to provide for diversion of water from an existing reservoir for industrial and recreational uses, flood control, and the irrigation of 190,000 acres in the two counties.[2]

UFF originally pled nine separate claims for relief; this appeal involves only UFF's amended ninth claim,[3] which sought to enjoin further construction of the initial stage because of the Secretary's failure to comply with § 12 of the Reclamation Extension Act of August 13, 1914, 43 U.S.C. § 418.[4] Section 12 requires that "before any contract is let or work begun for the construction of any reclamation project," the Secretary must have executed recordable contracts with *all* excess land owners within the project for the sale of their excess land to settlers at government-fixed prices. The Secretary conceded that *all* of the excess land owners had not executed recordable contracts. Nonetheless, the district court granted summary judgment for the defendants. The court ruled that § 46 of the Omnibus Adjustment Act of May 25, 1926, 43 U.S.C. § 423e[5] had superseded § 12 on

---

* H. Kenneth Wangelin, United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

1. This unit was originally authorized by Congress in the Flood Control Act of 1944, 58 Stat. 887 (1944), as part of the plan for development of the Missouri River set out in S.Doc. No. 191 and H.R.Doc. No. 475, 78th Cong., 2d Sess. (1944), and revised and coordinated by S.Doc. No. 24, 78th Cong., 2d Sess. (1944). In 1964 Congress specifically prohibited the expenditure of funds to start construction unless Congress reauthorized the unit. Pub.L.No. 88–442, 78 Stat. 446 (1964). In 1968 the project was reauthorized, Pub.L.No. 90–453, 43 U.S.C. § 616ttt-www (1968), and the plan was set out in H.R.Doc. No. 163, 90th Cong., 1st Sess. (1967).

2. The principal supply works proposed for delivery of the water include the Oahe pumping station, a system of canals, three regulatory reservoirs, a diversion dam on the James River, and a pumping plant at the diversion dam site. The diversion dam on the James River has been completed, construction has begun on the Oahe pumping station, and construction of the canal system is imminent as the Bureau of Reclamation has commenced land acquisition by purchase and condemnation.

3. The district court ruled that plaintiffs had standing under § 10 of the Administrative Procedures Act, 5 U.S.C. § 702, and the Secretary has not appealed that ruling. *United Family Farmers, Inc. v. Kleppe,* 418 F.Supp. 591, 594–9 (D.S.D.1976).

4. Section 12 of the 1914 Act provides:
   Before any contract is let or work begun for the construction of any reclamation project hereafter adopted, the Secretary of the Interior shall require the owners of private lands thereunder to agree to dispose of all lands in excess of the area which he shall deem sufficient for the support of a family upon the land in question, upon such terms and not to exceed such price as the Secretary of the Interior may designate; and if any landowner shall refuse to agree to the requirements fixed by the Secretary of the Interior, his land shall not be included within the project if adopted for construction.
   43 U.S.C. § 418.

5. Section 46 of the 1926 Act provides in part:
   No water shall be delivered upon the completion of any new project or new division of a project until a contract or contracts in form approved by the Secretary of the Interior shall have been made with an irrigation district or irrigation districts organized under State law . . . . Such contract or contracts with irrigation districts hereinbefore referred to shall further provide that . . no such excess lands so held shall receive water from any project or division if the owners thereof shall refuse to execute valid recordable contracts for the sale of such lands under terms and conditions satisfactory to the Secretary of the Interior and at prices not to exceed those fixed by the Secretary of the Interior; . . .
   43 U.S.C. § 423e.

projects built after 1926. He found § 46 allows construction to proceed even though all the excess land owners have not executed recordable contracts, but prohibits the delivery of water to excess land until a recordable contract for its sale has been executed. The district court certified the judgment for appeal under Fed.R.Civ.P. 54(b).

The issue on appeal turns on the propriety of the district court's ruling that § 46 of the Omnibus Adjustment Act of 1926 has superseded § 12 of the Reclamation Extension Act of 1914. We find the ruling correct and affirm the grant of summary judgment.

UFF urges that the 1926 Act did not expressly repeal § 12 and that the law looks with disfavor upon repeals by implication. *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936).[6] Plaintiffs argue that § 46 has not impliedly repealed § 12, because the two sections are capable of coexistence. They contend § 12 prevents construction until all the owners in the project agree to sell their excess lands at government-fixed prices. After construction is completed and the project is turned over to the irrigation district for management and debt retirement, UFF urges, § 46 then prevents the irrigation districts from delivering water to landowners who fail to comply with acreage limitation provisions.[7] In this way, UFF asserts, the overall intent of the reclamation laws is given effect by preventing large landowners from securing speculative land prices. *See Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

To determine whether the two sections are capable of coexistence requires an inquiry by this court as to whether Congress clearly and manifestly expressed an intention that § 46 was to supersede § 12.[8] *Mor-*

6. The Supreme Court has observed:
   *In the absence of some affirmative showing of an intention to repeal,* the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable. . . .

   .      .      .      .      .

   The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, *absent a clearly expressed congressional intention to the contrary,* to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible. . . . *The intention of the legislature to repeal 'must be clear and manifest.'*" *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). . . .
   *Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974) (emphasis added).

7. The problem was explained in *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093, 1134 n. 169 (9th Cir. 1976):
   The second problem arose out of the fact that § 11 of the 1914 Act, 38 Stat. 689, 43 U.S.C. § 465, was interpreted to permit project water to be furnished to excess lands until the Department gave official public notice of the construction charges allocated to each tract. Trust deeds normally did not require that excess lands be sold until this notice was given. The notice was often delayed, excess lands were supplied with water for a con-

siderable period of time, and the redistribution of such lands was delayed indefinitely. *See* Landownership Survey, supra note 92, at 42.
   Section 46 of the 1926 Act attacked both problems. . . . [T]he problem of indefinite delay in sale of excess lands under trust deeds was addressed by the provision that no project water was to be delivered until a repayment contract embodying the recordable contract requirements had been executed by the irrigation district.

8. In the 50 years since the enactment of the 1926 Act the Bureau of Reclamation's interpretation that § 46 supersedes § 12 has not been challenged. Until recently commentators, although criticizing the Bureau's interpretation as a matter of policy, have concluded without discussion that § 46 has superseded § 12. *See, e. g.,* 2 *Water & Water Rights,* § 120.2, at 235 (R.Clark ed. 1967). A recent article in the South Dakota Law Review, however, does address this issue and concludes that § 46 did not impliedly repeal or limit § 12. Comment, *Acreage Limitation and the Applicability of the Reclamation Extension Act of 1914,* 21 S.D.L.Rev. 737, 748–53 (1976).
   On two reported occasions the Commissioner of Reclamation has told Congress that the recordable contracts were not being required prior to construction. *Id.* at 745. On one occasion Congress specifically provided that recordable contracts be executed before construction began on the lands of the Arch Hurley Conservancy District in New Mexico. Act of August 2,

ton v. Mancari, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

The first restrictions on excess lands in reclamation projects was § 5 of the Reclamation Act of 1902, 43 U.S.C. § 431. Section 5 required that water could not be furnished to more than 160 acres in a single ownership. This restriction was to promote the anti-monopoly and anti-speculation policies of the reclamation laws. Because § 5 did not fully effectuate these policies, Congress enacted § 12 of the 1914 Act. Section 12 required that excess land owners must agree, prior to construction, to dispose of their excess lands. In addition § 12 imposed controls on the price at which excess land could be sold. Despite these new restrictions the promise of the reclamation laws was not fully realized. To determine what additional measures were needed to achieve these policy goals, the Secretary of the Interior appointed a committee known as the "Fact Finders." In 1924 the Fact Finders presented their report.[9] Among

their numerous proposals was the following recommendation:

That no reclamation project should hereafter be authorized until all privately owned land in excess of a single homestead unit for each owner shall have been acquired by the United States or by contract placed under control of the Bureau of Reclamation for subdivision and sale to settlers at a price approved by the Secretary. This price to be considered in determining what land and water will cost settlers and hence the feasibility of the project under the payment conditions of the law.[10]

In 1924 with the full support of President Coolidge and the Fact Finders, the Department of the Interior submitted H.R. 8836 to the House Committee on Irrigation and Reclamation. Hearings on H.R. 8836 and 9611 before the House Committee on Irrigation and Reclamation, 68th Cong., 1st Sess. (1924). The fundamental purpose of the bill was to provide a new plan for repayment to the federal government of the construction costs of future irrigation projects.[11] One of the major changes in the

---

1937, ch. 55, 50 Stat. 557, as amended, 43 U.S.C. § 600a (1964). There is no such requirement in the legislation for the initial stage of the Oahe Diversion Unit, James Division of the Missouri River Basin Project.

9. Federal Reclamation by Irrigation, S.Doc. No. 92, 68th Cong., 1st Sess. (1924).

10. Id. at 4.

11. One of the main concerns of the House committee members was whether this bill would affect existing projects. On existing projects the government had entered into contracts with individual water users calling for repayment of construction costs on a per acre basis. The bill proposed that construction costs be determined by reference to the land's productivity. Since on a productive farm the cost per acre would be cheaper than one calculated on the basis of productivity, the committee was concerned whether the bill could cancel these contract rights. Among the proponents of the bill were Dr. Elwood Mead, Commissioner of the Bureau of Reclamation; Gov. Thomas H. Campbell, Chairman of the Fact Finders; and Ottomar Hamele, general counsel for the Bureau. Their testimony makes it clear that this problem was not raised since the bill only affected future projects. They further testified that existing projects could elect to change over to the new repayment system, only if all the landowners agreed. Hearings on H.R. 8836 and 9611 be-

fore the House Committee on Irrigation and Reclamation, 68th Cong., 1st Sess. at 13–20, 45 (1924).

Although the hearings manifest that the repayment provisions of H.R. 8836 were intended to be the controlling provisions on future projects, it was also clear that other provisions of the bill were intended only to supplement existing legislation. For example the hearings indicate that § 9 of the bill, dealing with the turning over of control of the project by the government, did not supersede the 1902 or 1914 Acts, but rather supplemented them. Id. at 132.

The only indication of whether the proviso of § 3 of H.R. 8836, dealing with disposal of excess private lands, was intended to supersede or supplement § 12 of the 1914 Act appears in terms of "amplification" and "extension." Id. at 350–51. Although this language could impliedly be interpreted that § 3 does not supersede § 12, a comparison of the two shows that they are irreconcilable and reveals that § 3 was intended to replace § 12 on new projects. The purpose of both sections was to break up large land holdings within the project and to re-distribute these lands to settlers at nonspeculative prices. Under § 12 these goals were accomplished by requiring the owner of excess land to agree with the government to resell his land to the settlers at government-fixed prices. The government's role under this scheme was basi-

repayment system proposed by the bill was that the government would execute the repayment contracts with irrigation districts organized under state law. In the past the government entered into repayment contracts with the individual landowners. This change was allegedly designed to provide for better management of the projects and to further insure repayment. *Id.* at 35. The bill's mandate was that these contracts must be entered into before any money could be expended for construction for "any *new* project or any *new* division of a project." (Our emphasis).

With the exception as to holders of federal land grants, the proposed legislation varied the disposal scheme of § 12 of the 1914 Act by requiring all excess private land to be *sold* to the United States before any money could be expended on construction.[12]

The Omnibus Adjustment Act of 1926, as finally passed, embodied many of the provisions of H.R. 8836 and the Fact Finders' proposals, but relevant here, the 1926 Act provided a salient variance as relating to the disposal of excess lands. First, in § 46 the execution of the repayment contracts

with the districts was *conditioned* upon the delivery of water and not the expenditure of construction funds as proposed in the bill. Also in § 46 the provisions dealing with the disposal of excess private and public lands were merged. The proposal for the acquisition of the excess private land by the government was deleted, and § 46 as passed required the execution of "recordable contracts" for the sale of the land. However, the important change in § 46, relevant here, is that the recordable contracts must be executed prior to delivery of project water rather than prior to the expenditure of construction funds.

A 1926 Senate Report gives indication for the reason that the *repayment* contract was to be conditioned upon the delivery of water and not the expenditure of construction funds, but it does not reveal the reason for the corresponding change of the time for the execution of the *recordable* contracts.[13] The only legislative history relating to this change is the testimony during the hearings on H.R. 8836. In *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093 (9th Cir. 1976),[14] Judge Browning described the concern expressed during the

cally supervisory, but under § 3 the government's participation was to be more active and extensive. To achieve the same anti-monopoly and anti-speculation policies, § 3 required the government to purchase the land and to resell it to the settlers, thus eliminating the private owner from the sale. The two schemes are irreconcilable because there is no need for the recordable contract if the government purchases all the excess land. However the fundamental purpose of § 3 is not irreconcilable with § 12 and in this sense § 3 amplifies and extends § 12.

**12.** In contrast the proposed bill required holders of federal land grants only *to agree* to sell their excess land to settlers at government-fixed prices before any money could be expended on construction. *See* n. 11, *supra.*

**13.** The Report stated:

    .    .    .    .    .

8. On page 33, lines 11, 12 and 13, strike out the following words, "No part of any sum hereafter appropriated for any new project or new division of a project shall be expended for construction purposes," and insert in lieu thereof the following: "No water shall be delivered upon the completion of any new project or division of a project." This sec-

tion, as approved by the House, would prevent appropriations by Congress for new projects or new divisions until proper contracts had been made by the United States with an irrigation district or irrigation districts. It is thought, however, that contracts could not be successfully negotiated until after some action involving an appropriation had been taken by the Federal Government, and that the language recommended by your committee will amply protect the United States in the desired manner.
S.Rep. No. 831, 69th Cong., 1st Sess. 3 (1926).

**14.** In *United States v. Tulare Lake Canal Co., supra,* the court was presented with the question of whether by payment of construction charges, owners of excess land could avoid the obligation to execute recordable contracts providing for the sale of their excess land at government-fixed prices. In considering this "payout" theory Judge Browning made an exhaustive study of excess land provisions and concluded that § 46, not § 12, governed the disposition of excess private land within projects built after 1926. 535 F.2d at 1133. Judge Browning found this interpretation of the two sections to be the clearly expressed intention of Congress.

hearings and the reason for the subsequent change:

> Under the Fact Finders' proposal, construction could not have begun until all owners of excess lands transferred such land to the United States or contracted to sell it at government-fixed prices, just as under section 12 of the 1914 Act. As we have shown, subsequent "payout" could not have avoided disposal. Section 46 as passed allows construction to proceed, but bars delivery of project water to excess land until a recordable contract for its sale is executed. The reasons for the change are clear, and reflect no diminution of Congress' determination to break up excess landholdings. In the course of committee hearings, it was pointed out that under the Fact Finders' proposals, construction of a project might be prevented or delayed if even one owner refused to transfer or contract to sell excess land; Congress obviously thought it necessary to avoid such an impasse.

535 F.2d at 1133 (footnotes omitted).

We agree that it was the clear and manifest intent of Congress to avoid such an impasse and that this intent can only be effectuated by interpreting § 46 as superseding § 12 on all reclamation projects started after 1926. Therefore in order for the construction of the initial stage of the Oahe Diversion Unit to be conditioned upon the execution of recordable contracts, Congress must expressly so provide.[15] We find no such requirement in the legislation for the initial stage of the Oahe Diversion Unit[16] or the Missouri River Basin Project.[17]

The judgment is affirmed.

15. The floor debate on a public works appropriations bill in the Senate on August 23, 1965, indicates that Congress intends § 46 to supersede § 12 unless the contrary is specifically required. 111 Cong.Rec. 21384–21400 (1965). An example of Congress specifically conditioning the appropriation of construction funds upon the execution of recordable contracts is the Act of August 2, 1937, ch. 55, 50 Stat. 557, as amended, 43 U.S.C. § 600a (1964). *See* n. 8, *supra.*

16. The authorization statute provides:

> The Secretary of the Interior is hereby authorized to construct, operate, and maintain in accordance with the Federal reclamation laws (Act of June 17, 1902 (32 Stat. 388) and Acts amendatory thereof or supplementary thereto) . . . .

43 U.S.C. § 616ttt (1968).

17. *See* n. 1, *supra.*