**UNITED STATES of America, Plaintiff,**

v.

**IMPERIAL IRRIGATION DISTRICT, a corporation, Defendant,**

**John M. Bryant, Robert C. Brown, Theodore B. Shank, Harold A. Brockman, Clara Marie Gutierrez, Charles E. Nilson, Kakoo D. Singh, Stephen H. Elmore and John Kubler, Jr., Landowner Defendants, both individually and on behalf of members of a class, to wit, all persons owning more than 160 acres of irrigable land within the Imperial Valley in California.**

**State of California, Intervening Defendant.**

**No. 67-7.**

United States District Court, S. D. California.

Jan. 5, 1971.

Harry D. Steward, U. S. Atty., Fredrick B. Holoboff, Asst. U. S. Atty., Gary D. Weatherford, Sp. Asst. Atty. Gen., San Diego, Cal., David Warner and Milton Nathanson, Dept. of Justice, Washington, D. C., for plaintiff.

Horton, Knox, Carter & Rutherford by Reginald L. Knox, Jr., El Centro, Cal., for defendant Imperial Irrigation District.

O'Melveny & Myers by Pierce Works, Charles W. Bender and Patrick Lynch, Los Angeles, Cal., and Hervey & Mitchell by Thomas R. Mitchell, San Diego, Cal., for the Landowner Defendants.

Thomas C. Lynch, Atty. Gen. by David B. Stanton, Deputy Atty. Gen., Los Angeles, Cal., for the State of Cal.

## MEMORANDUM OPINION

TURRENTINE, District Judge.

### I. JURISDICTION AND NATURE OF THE CONTROVERSY

This is a civil action brought by the United States. This court has jurisdiction under Title 28, § 1345 of the United States Code. An actual controversy within the jurisdiction of this court exists as to whether the land limitation provisions of reclamation law (hereinafter "acreage limitation" or "160-acre limitation") have any application to privately owned lands lying within the boundaries

of said defendant Imperial Irrigation District (hereinafter "District").

The parties to this controversy are plaintiff United States of America, defendant District, landowner defendants John M. Bryant, Robert C. Brown, Theodore B. Shank, Harold A. Brockman, Clara Marie Gutierrez, Charles E. Nilson, Kakoo D. Singh, Stephen H. Elmore and John Kubler, Jr., and each of them, both individually and on behalf of members of a class, to wit, all persons owning more than 160 acres of irrigable land within the District (hereinafter collectively, "landowner defendants") and intervening defendant State of California (hereinafter "California"). Heretofore, by orders duly entered, California and the landowner defendants were granted leave to intervene herein, the latter pursuant to Rule 23(b) (2), Federal Rules of Civil Procedure as representatives of a class consisting of some 800 persons, each of whom own irrigable lands in excess of 160 acres. The aggregate holdings of the members of the class were approximately 233,000 acres as of September 3, 1965.

Plaintiff contends that the 160-acre limitation applies to privately owned lands within the District; and all of the defendants contend in all respects to the contrary.

There is no controversy between plaintiff and the State of California over the application of the excess land laws to the state lands in its Imperial Waterfowl Management Area. The United States, the defendant District and private landowner defendants agree with the State of California that those state lands are not subject to the excess land laws.

This opinion incorporates the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## II. HISTORICAL BACKGROUND

The Imperial Irrigation District consists of lands in the Imperial Valley in California. Due to the below-sea-level topography of the Imperial Valley area, it was recognized as early as the middle of the 19th century that irrigation by means of diversion and gravity flow from the Colorado River was feasible. In comparatively recent geologic time, the Gulf of California extended inland to the northwest. Its upper limits reached northward of Indio. Through the years, the heavily silt-laden Colorado River deposited sediment and built up a low, flat deltaic ridge entirely across the ancient gulf, cutting off the upper portion from its connection with the ocean. The resulting basin was then an inland sea with a surface area of nearly 2,000 square miles. The greatest depth of this sea was about 320 feet. Deprived of its connection with the Gulf of California, the severed sea dried up, and a portion of the bed which it occupied is now known as the Salton Basin. The greater area around and including this basin is known in its northern part as the Coachella Valley and in its southern part as the Imperial Valley.

In its natural condition, the entire region was an unproductive desert. The annual rainfall averages from two to three inches. The Colorado River and the Colorado River Delta east and south of the Imperial Valley are slightly above sea level. From the delta, the land slopes gradually north and west toward the center of Imperial Valley, which is almost entirely below sea level.

During occasional flooding of the Colorado River, the overflow waters would flow down the slopes of the delta northward into the bottom of the great depression and the Salton Basin. These floodwaters would concentrate more or less in depressions and channels leading from the delta region into what is now known as Salton Sea. These channels, or depressions, form natural canals for diversion of the Colorado River waters into Imperial Valley.

The initial appropriations and diversions of water from the Colorado River were made by the California Development Company, a privately owned corporation organized in 1896 and the predecessor in interest of defendant District,

which was organized in July of 1911. These appropriations and diversions laid the foundation for the present perfected water rights which have admittedly existed within the boundaries of the District from and after June 25, 1929, the effective date of the Boulder Canyon Project Act.

The first water from the Colorado River was diverted and brought to the Valley in July of 1901. This water, which was diverted about one mile north of the international boundary with Mexico, was carried by the Alamo Canal through Mexican territory and back into the United States at Imperial Valley to avoid the high mesa and sand-hill country north of the international boundary. For most of its 50 mile course in Mexico, this canal made use of an ancient overflow channel known as the Alamo River, which formerly led into the Salton Sea.

The Alamo Canal, from its point of reentry into the United States, as well as the lateral canals through which water diverted from the river was ultimately distributed to land in the Valley, were owned by seven mutual water companies which were organized by the California Development Company. The stock in such mutual water companies was ultimately acquired by the individual landowners to whose land the water was supplied.

By 1903, through the distributive facilities constructed by the local mutual water companies, approximately 25,000 acres of valley lands were in irrigated cultivation, all as a result of diversions from the River. By the following winter, the irrigated acreage was increased to 100,000. 181,191 acres were irrigated by 1910, 308,009 in 1916, 413,440 in 1919, and 424,145 in 1929, the year when the Boulder Canyon Project Act took effect.

In 1905, the Colorado River broke through its banks, which had over the years been built up above the surrounding terrain, and completely changed its course, sending a flood of water through the Alamo Canal and over the broad flat area of Imperial Valley. As a consequence, for many months the entire flow of the River passed through the washed-out heading, through the Alamo Canal and into Imperial Valley, creating Salton Sea with a surface area of 330,000 acres, and threatening the entire valley with destruction. The surface of the Salton Sea, formerly nearly dry at an elevation of 273 feet below sea level, was raised to 190 feet below sea level. The efforts of the California Development Company to close the breach were unsuccessful. The Southern Pacific Company's tracks being endangered, the Southern Pacific Company advanced funds to the California Development Company to control the River and took controlling interest therein as security. By utilizing its own resources the Southern Pacific Company closed the breach in the west bank of the River and returned the River to its channel. In the Spring of 1916, the Southern Pacific Company foreclosed on the California Development Company's interests and, in June of that year, transferred them to defendant District.

In 1922–1923 District acquired all of the mutual water companies that had been organized by California Development Company. Since that time and until the present, the District has performed the entire function of diverting, transporting and distributing the water supply to farm holdings in Imperial Valley.

On November 24, 1922, the Colorado River Compact, an interstate agreement relating to allocations and rights in the waters of the River, was signed by commissioners representing the States of Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming. It became effective June 25, 1929.[1]

The construction of the All-American Canal was authorized as part of the gen-

I. The Colorado River Compact was authorized by an Act of Congress dated August 19, 1921, 42 Stat. 171, and by the Acts of the Legislatures of the participating states. Congress approved it in section 13 of the Boulder Canyon Project Act, 43 U.S.C. § 617l.

eral project authorized by the Boulder Canyon Project Act (hereinafter "Project Act" or "Act") of December 21, 1928, effective June 25, 1929, 45 Stat. 1057, 43 U.S.C. § 617 et seq.

At the time of the taking effect of said Project Act, the District had a distribution and drainage system which was wholly financed, constructed, maintained and operated by local means. The distribution system then, as of June 25, 1929, comprised approximately 1,700 miles of main and lateral canals, providing for the irrigation by waters diverted by it from the Colorado River of approximately 424,000 privately owned acres, computed on a single cropping basis. All of this acreage was, as of June 25, 1929, being irrigated by and with Colorado River water, carried through the Alamo Canal. In 1966, just prior to the bringing of this action, there were approximately 438,000 acres irrigated with water transported through the All-American Canal.

Pursuant to the Project Act, the Government constructed Hoover Dam, at Black Canyon, and incidental works, completing the construction of the dam in 1935. On February 1, 1935, under the direction of the then Secretary of the Interior (hereinafter "Secretary"), Harold L. Ickes, the Government began storing water in Lake Mead, the reservoir created by Hoover Dam, and since that date the Government has continuously operated and maintained Hoover Dam for the purposes specified in the Project Act.

On December 1, 1932, the United States and the District, acting pursuant to the Project Act, entered into a contract providing, *inter alia*, for construction of a main canal connecting Imperial and Coachella Valleys and requiring repayment by the District for the costs of construction. Due to conflicts not material to this case, Coachella Valley landowners were not included in the District, but formed a separate District, the Coachella Valley County Water District, which executed a similar, though independent, contract with the United States

in 1934 calling for construction of water delivery structures and delivery to lands in Coachella Valley.

Pursuant to its 1932 contract with the District, the United States constructed Imperial Dam and the All-American Canal, commencing construction in August, 1934. In 1940, the United States, while retaining the care, operation and maintenance of these facilities, commenced delivering water through the All-American Canal for use within the District. Also pursuant to the contract, the Secretary transferred to the District, on March 1, 1947, the care, operation and maintenance of the main branch of the All-American Canal west of Engineer Station 1098.

Since 1942, the District's entire water supply has been carried through the All-American Canal. Title to the Imperial Dam and the All-American Canal, as well as to Hoover Dam, is in the United States.

On March 4, 1952, the contract between the United States and the District was amended by a supplemental contract. On May 1, 1952, the Secretary transferred to the District the care, operation and maintenance of the works east of Engineer Station 1098.

The All-American Canal System, as provided for in the contract of December 1, 1932, was declared completed by the contract of March 4, 1952, between the United States and the District; repayment of construction charges commenced on March 1, 1955. The District's financial obligation was fixed at approximately $25,000,000, repayable in forty annual installments, without interest. All such payments to date have been made from net power revenues derived from the sale of electrical energy generated by hydro-electrical facilities of the All-American Canal, costing the District approximately $15,000,000. The cost of Hoover Dam and powerplant, estimated in 1965 as $174,732,000, is being repaid with interest at three percent primarily from power revenues at the dam. One exception to this is that $25,000,000, of

the cost of the dam, which was allocated to flood control, will be carried interest free by the Government until 1987.

## III. DEVELOPMENT OF THE CONTROVERSY

The 1932 contract provided, *inter alia*, for repayment by the District of the cost of the project works. It did not contain any provision requiring that acreage limitation apply to private lands within the District. On February 24, 1933, Secretary of the Interior, Ray Lyman Wilbur, in a letter mailed to the District, ruled that the 160-acre limitation did not apply to privately owned lands within the District.[2]

The Wilbur ruling was followed for 31 years and gave rise to an administrative practice which held the 160-acre limitation to be inapplicable to private landholdings within the District and which endured for the same period and down to the rendition of Solicitor Frank J. Berry's opinion of December 31, 1964.[3] In that opinion, the Solicitor concluded that Secretary Wilbur's 1933 ruling was erroneous and that the Boulder Canyon Project Act by its plain terms incorporates those provisions of reclamation law which impose acreage limitation on lands served from federal reclamation projects, including the privately owned lands within the District.[4]

Subsequent to this ruling, the Department for several years attempted to negotiate a new contract with the District which would have incorporated acreage limitation. The failure of these negotiations resulted in this action for declaratory relief.

## IV. THE BASIC ISSUE

The question of whether the 160-acre limitation has any application to privately owned lands within the boundaries of the Imperial Irrigation District depends upon an interpretation of the Project Act. In deciding this case, defendants urge the court to limit its inquiry to a judicial review of the 1933 Wilbur ruling. They contend that because of the longstanding administrative practice and the reliance thereon by landowner-defendants in the District, Wilbur's interpretation should be upheld if there is any reasonable basis for his decision, citing Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, reh. den. 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). The court declines to follow this course and believes that this statement of the *Tallman* rule should not be controlling in this case for the following reasons.[5] In *Tallman*, the suit was brought by an unsuccessful applicant for an oil and gas lease in the Kenai National Moose Range in Alaska. For many years, the Secretary of the Interior had interpreted Executive Order 8979 and Public Land Order 487, which withdrew certain lands from settlement and commercial exploitation, as not prohibiting oil and gas leases because they were not "dispositions" as that term is found in the Executive Order 8979. The first applicants received the particular lease in question; the unsuccessful applicant asserted that these regulations had closed the lands to such leases and that his lease should be issued because the prior applicants had applied when the lands were closed under the terms of these regulations. The court held that the Secretary's established in-

2. The full text of the letter is published in 71 Decisions of the Department of the Interior 496, App. E at 529.

3. 71 Decisions of the Department of the Interior 496.

4. The study leading up to this opinion was prompted by a letter dated August 7, 1961, from Senator Clinton P. Anderson, Chairman of the Committee on Interior and Insular Affairs, to Secretary Stewart Udall. In the letter, Senator Anderson advised the Secretary that he had received complaints from Southern California that the acreage limitation provisions of reclamation law were not being enforced in the Coachella and Imperial Valleys.

5. There is of course no quarrel with the principle that in problems of statutory construction great deference is given to the administrative interpretation. See Udall v. Tallman, *supra*, 380 U.S. at p. 16, 85 S.Ct. 792 and cases cited therein.

terpretation was reasonable and hence entitled to controlling weight. The court observed that great deference is given to administrative interpretation of statutes, and that:

> "When the construction of an *administrative regulation* rather than a statute is in issue, deference is even more clearly in order." [6] (emphasis supplied)

In this case, the basic problem is the meaning of an Act of Congress, not an administrative regulation. In addition, the controversy in *Tallman* was essentially a competition of private interests for commercial leases, while the decision whether acreage limitation applies under the Project Act involves important considerations of national policy, making this case less appropriate for application of the estoppel-like features of *Tallman*. If Secretary Wilbur was wrong, then he defeated a Congressional mandate extensively developed in reclamation law. Finally, in *Tallman* there was a consistent administrative practice, while here the Government has repudiated its former interpretation. The court therefore adopts the goal of determining whether Congress intended in the Project Act to apply acreage limitation to privately owned lands in the Imperial Valley.

This is the first stage of a bifurcated trial. Not included in this phase of the proceedings are the nature and extent of "present perfected rights" of the landowner-defendants, as that term is defined in the Supreme Court decree in Arizona v. California, 376 U.S. 340, 341, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964), or the issue of whether the landowners have any "vested rights" to Colorado River water as against the United States.

## V. THE STATUTORY LANGUAGE

Plaintiff contends that the Boulder Canyon Project Act is a reclamation project, and that §§ 1, 4(b), 12 and 14 incorporate general reclamation law, one portion of which is § 46 of the 1926 Omnibus Adjustment Act, 43 U.S.C. § 423e.

The latter statute provides that no privately owned lands in excess of 160 acres shall receive water from a new project or new division of a project. Therefore, the acreage limitation must apply to private lands within the District.

Four sections in the Project Act advert to reclamation law. Section 1 provides that construction costs for the canal are to be reimbursable as provided in the reclamation law.

Section 4(b) of the Project Act instructs the Secretary to provide for revenues

> " * * * by contract or otherwise, adequate in his judgment to insure payment of all expenses of construction, operation, and maintenance of said main canal and appurtenant structures in the manner provided in the reclamation law * * * "

Section 12 defines reclamation law as the 1902 Reclamation and Acts "amendatory thereof and supplemental thereto."

Section 14, heavily relied on by plaintiff, states:

> "This [Act] shall be deemed a *supplement to the reclamation law*, which said reclamation law shall govern the construction, operation, and management of the works herein authorized, *except as otherwise herein provided*." (emphasis supplied)

Plaintiff asserts that the phrase "construction, operation and management of the works" includes water delivery. Since § 46 of the 1926 Act was the most recent addition to reclamation law at the time the Project Act was passed, it applies to condition delivery of water upon compliance with acreage limitation.

Plaintiff continues by pointing out that §§ 1 and 4(b) of the Project Act require repayment contracts pursuant to reclamation law, and the only means of contracting in 1932 was in accordance with § 46 which required acreage limitation. Thus, the 1932 contract necessarily incorporated an acreage limitation applicable to private lands. Limited to

---

6. Udall v. Tallman, *supra*, at p. 16, 85 S.Ct. at p. 801.

these facts, plaintiff's theory of the statute is disarmingly simple.

Closer examination reveals, however, that the references to reclamation law are carefully qualified, most noticeably by the § 14 language that reclamation law applies "except as otherwise herein provided." And Congress has "otherwise provided" in § 5 that the Secretary may contract for storage and delivery of water.[7] Section 5 does not refer to reclamation law or acreage limitation, and this is the section where such reference would be most logical if water delivery is to be conditioned on acreage limitation. Where Congress has employed a term in one place and excluded it in another, it should not be implied in the section where it is excluded. Federal Trade Commission v. Sun Oil Co., 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). The repayment provisions of § 4(b) are limited to expenses of construction, operation and maintenance; there is no mention in this section of water delivery.

Section 1 of the statute requires reimbursement for the main canal and auxiliary structures under reclamation law, but the clause immediately following this language, " * * * and shall not be paid out of revenues derived from the sale or disposal of water power or electric energy * * *," suggests that the reference to reclamation law merely establishes the principle expressly added, i. e., that the works are not to be paid for by the sale of power. Perhaps most damaging of all to plaintiff's case is the sentence next following:

"Provided, however, That no charge shall be made for water or for the use, storage, or delivery of water for irrigation * * * in the Imperial or Coachella Valleys."

This express exemption from charges for water is one example of the distinction between water delivery and the concepts of reimbursement for project costs and the "construction, operation and maintenance" which is drawn throughout the statute. Other examples are found in Sections 8(a) [8] and 8(b).[9] This treatment hardly supports the conclusion that the phrase "construction, operation and maintenance" in § 14 includes water delivery.

In considering plaintiff's incorporation theory, an essential inquiry is whether § 46 is consistent with other terms of the Project Act. A comparison of section 4(b) of the Project Act with § 46 of the Omnibus Adjustment Act reveals differences which point to a displacement of § 46 by the terms of the Project Act. Section 46 contracts are mandatory, while § 4(b) contracts are discretionary. Section 46 deals with both repayment and limitation on water delivery, but § 4(b) does not mention water delivery because § 5 covers that topic. And § 46 contracts must be executed before water delivery, while § 4(b) contracts are to be executed before money is appropriated. From this it appears that the only item in § 46 not expressly provided for in the Proj-

---

7. Section 5 provides in part as follows: "[That] the Secretary of the Interior is hereby authorized, under such general regulations as he may prescribe, to contract for the storage of water in said reservoir and for the delivery thereof * * * upon charges that will, * * * in his judgment cover all expenses of operation and maintenance incurred by the United States on account of works constructed under this [Act] and the payments to the United States under subdivision (b) of Section 4."

8. Section 8(a) provides in part: "The United States * * * shall observe and be subject to and controlled by said Colorado River compact in the construction, management, and operation * * * *and* the storage, diversion, delivery, and use of water * * *" (emphasis supplied)

9. Section 8(b) provides in part: "Also the United States, in constructing, managing, and operating the dam, reservoir, canals, and other works herein authorized, *including* the appropriation, delivery, and use of water * * * shall observe * * * the terms of such compact." (emphasis supplied) The use of the word "including" seems intended to emphasize the distinctions developed elsewhere.

ect Act is the acreage limitation, an issue of social policy and not mere technical details of contracting. It is unlikely that Congress would relegate an issue as important as acreage limitation for private lands to indirect inclusion. This belief is reinforced by § 9 of the Project Act, which expressly limits public land entries entitled to use project water to 160 acres. The absence of a similar provision for private lands indicates that Congress did not apply acreage limitation to private lands. If the Project Act did incorporate general reclamation law, then § 3 of the 1902 Act [10] would apply and the specific direction of § 9 would be unnecessary.

Plaintiff's contention that the 1932 contract between the Government and District was made pursuant to § 46 is unsupported. The contract at Article I recites that it was made pursuant to the 1902 Reclamation Act "and acts amendatory thereof or supplementary thereto * * * and particularly pursuant to" the Project Act. Consequently, the contract could simply have been made pursuant to § 5 of the Project Act and § 1 of the 1922 Reclamation Act, 43 U.S.C. § 511.[11] The mere existence of § 511 forecloses the argument that § 46 of the 1926 Act provided the only means of contracting for repayment in 1932 and indicates that if Congress had intended § 46 to apply, it would have so stated.

Finally, the Project Act contains a comprehensive set of provisions relating to the rights of prior appropriators of Colorado River Water under the Colorado River Compact. Section 6 of the Project Act names as the second use of the dam and reservoir the "irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact * * * *" Under the decree in Arizona v. California construing the Project Act, the application of a specific quantity of water to a defined area of land is an essential element of a perfected right.[12] It was held in the court's opinion that the Secretary is required to satisfy present perfected rights.[13] This duty of the Secretary to supply water to an area where present perfected rights exist is repugnant to the concept that the United States may at the same time shut off water deliveries destined for lands, be they excess or not, entitled to the beneficial use of Colorado River water in the exercise of these rights.

Section 8(a) of the Project Act subjects the United States and all water users to the controlling effect of the Colorado River Compact and constitutes a recognition by Congress of the guarantee of present perfected rights found in Article VIII of the Colorado River Compact.

In Section 13 of the Project Act, the Colorado River Compact is approved. There is a second statement that the rights of the United States are controlled by the Compact, and the pre-project water rights are made covenants running with the land for the benefit of water users. These covenants are expressly made available to them for use in any litigation concerning Colorado River water.

The combined effect of §§ 6, 8(a) and 13 of the Project Act is to express Congressional intent that the present perfected rights be protected from interfer-

10. 43 U.S.C. §§ 416, 432, 434. This statute provides that public lands proposed for irrigation under reclamation projects shall be withdrawn and subject to entry under the homestead laws in tracts of not more than 160 acres.

11. 43 U.S.C. § 511 provides that in carrying out the purposes of reclamation law, the Secretary may contract with irrigation districts for repayment of the costs, of construction, operation and maintenance of irrigation works. It also recites that no such contract will be binding on the United States "until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid."

12. 376 U.S. 340, 341, 84 S.Ct. 755.

13. 373 U.S. 546, at 566, 581, 584, 83 S.Ct. 1468, 10 L.Ed.2d 542.

ence by any contrary provision of the Project Act or reclamation law. The specific and repeated guarantees found in these sections indicate that any provision such as acreage limitation which would curtail such rights would be detailed in correspondingly exact language. Neither the references to reclamation law contained in §§ 1, 4(b), 12 and 14 of the Project Act, nor any other term thereof demonstrate Congressional intention that acreage limitation apply to privately owned lands in the District.

Two additional propositions urged by plaintiff merit consideration in construing the statutory language. First, it is contended that the Project Act created a federal subsidy; and that therefore the Act must be strictly construed against the grantees (defendants). Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). However, the Project Act set in motion a great project conferring many and important benefits on all parties involved, including the United States.[14]

Among the national interests advanced by the Boulder Canyon Project are included:

1) The inclusion within the District by annexation, pursuant to Article 34 of the contract between the Government and the District dated December 1, 1932, of some 250,000 acres of Government lands.

2) Added capacity in the Canal for the servicing of such lands and some 11,000 acres of Indian land.

3) Flood control for the purpose of preserving the Laguna Dam and protecting the Yuma Reclamation Project as well as protecting the public lands and private interests in Imperial Valley.

4) The control of silt because of the federal government's problem in handling silt in the Yuma Project.

5) The need to build a canal on All-American soil to put the United States in a position to bargain with the Mexican Government over the use of the water of the Colorado River.

6) It enabled the United States Government to reclaim and put to use large tracts of public and Indian lands of the United States in Coachella Valley. Application of this rule of construction does not advance the search for acreage limitation in the Project Act.

In a related argument, plaintiff also contends that because there is no express exemption from the acreage limitations of reclamation law, the limitation must apply. In this matter, reliance is placed on the following statement in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 292, 78 S.Ct. 1174, 1184, 2 L.Ed.2d 1313 (1959):

"* * * where a particular project has been exempted because of its peculiar circumstances, the Congress has always made such exemption by express enactment."

The guidance afforded by this remark is of doubtful value in this case, because in *Ivanhoe* the legal issue was whether state law precluded applicability of acreage limitation. The case is also factually distinguishable in that one basic ingredient of the Imperial Valley situation, the guarantee of perfected rights by Congress, was wholly lacking in the Ivanhoe context.[15]

---

14. A report of the Congress which passed the Project Act detailed the benefits to all parties and described the Project as a joint venture by necessity:
   "Neither Imperial Irrigation District, the Coachella district, nor the United States could afford alone to build a canal from the river. Acting in conjunction, the canal is entirely feasible." Report No. 592, 70th Congress, March 20, 1928 at p. 21.

15. Indeed, it is doubtful whether the landowners before the court in *Ivanhoe* had any vested rights which Congress could have guaranteed. Certainly the landowners in the Ivanhoe District itself did not. See Ivanhoe Irr. Dist. v. All Parties and Persons, 47 Cal.2d 597, 654, 658, 306 P.2d 824 (Dis. op.); Ivanhoe Irr. Dist. v. McCracken, *supra*, 357 U.S. 275, 285, 78 S.Ct. 1174, 1180: "It is interesting to

Finally, it appears that the practice, cited by plaintiff, of enacting express statutory exemptions did not come into vogue until 1938 with the Colorado-Big Thompson Project.[16] This was some ten years after passage of the Boulder Canyon Project Act.

## VI. LEGISLATIVE HISTORY

Secure in the belief that the statutory language clearly precludes an incorporation of acreage limitation, the court approaches legislative history with reluctance. The perils inhering in an imaginative recreation of the mind of Congress have been described by Mr. Justice Jackson, who termed the process a "psychoanalysis of Congress." [17] The language sought in the halls of Congress can usually be found in one place or another, and this is particularly true here, for the proceedings in Congress which culminated in the Project Act in 1928 spanned nearly a decade. However, the disagreement of experts in reclamation law, and the abrupt reversal of Departmental policy require some examination of legislative history for its teachings on Congressional intent.

The first Kettner Bill (H.R. 6044) in 1919 regarding construction of the Boulder Canyon Project did not contain an express provision for acreage limitation. In 1920, a second Kettner Bill (H.R. 11553) was introduced which contained a specific acreage limitation provision. It became apparent that more technical studies were needed before embarking on this ambitious project, and Congress in 1920 authorized a study which resulted in the comprehensive Fall-Davis Report.[18] The Report reaffirmed prior recommendations for an All-American Canal, and, based upon engineering studies of dam sites, recommended the construction of a high dam in Boulder Canyon.

Shortly after publication of the Report, Senator Hiram Johnson and Congressman Phil Swing introduced identical bills in the Senate and House proposing construction of an All-American Canal and a high dam near Boulder Canyon. These bills did not contain an express acreage limitation provision. Due to continuing controversy over dam sites, neither bill was reported out of committee during the 67th Congress.

When the 68th Congress convened, Senator Johnson and Congressman Swing again introduced identical bills, neither providing expressly for acreage limitation, but again neither bill was reported out of committee.

In the 69th Congress, Senator Johnson and Congressman Swing each introduced two more bills. During hearings in 1926 before the House Committee on Irrigation and Reclamation, the question arose whether either of the pending Swing Bills (H.R. 6251 and H.R. 9826) would make acreage limitations apply to private lands in the Imperial Valley. Congressman Swing and Dr. Elwood Mead, then Commissioner of the Bureau of Reclamation, both stated unequivocally that nothing in either of the bills would require a landowner to dispose of holdings in excess of 160 acres in order to receive water from the All-American Canal:

"MR. SINNOTT.[19] I would like to ask the doctor is there any provision in the bill sponsored by the Secretary on the farm unit on the lands to be irrigated?

"DR. MEAD. This bill does not go beyond the provisions for three things. One is the dam—the reservoir—and the second is the power plant, and the third is the All-American Canal. It does not

---

note that irrigators in this district receive water diverted from the San Joaquin in which they never had nor were able to obtain any water right."

16. 43 U.S.C. § 386.

17. United States v. Public Utilities Commission, 345 U.S. 295, 319–320, 73 S.Ct. 706, 97 L.Ed. 1020 (1953).

18. Sen.Doc. 142 Problems of the Imperial Valley and Vicinity 67th Cong. 2nd Sess. (1922).

19. Congressman Sinnott of Oregon.

deal with irrigation of new lands [20] at all.

"THE CHAIRMAN. [Congressman Addison T. Smith] That is reserved for future legislation?

"DR. MEAD. Yes, Sir.

" * * *

"MR. SINNOTT. The present owner can occupy his present farm unit?

"DR. MEAD. Yes, sir.

"MR. SINNOTT. *No matter what that might be?*

"DR. MEAD. Yes.

"MR. SINNOTT. What is that now in the Imperial Valley?

"DR. MEAD. Of course, it varies widely. There is not any law. *There are a good many large holdings there.*

" * * *

"MR. SINNOTT. There is nothing in this bill requiring the landowner to sell the surplus over a farm unit of 160 acres at a price to be fixed by the Secretary, as is now in the present reclamation law?

"MR. SWING. *no, sir.*" (emphasis supplied) [21]

After completion of the hearings, Congressman Leatherwood of Oregon prevailed upon the committee to amend its print of H.R. 9826 by including an amendment requiring acreage limitation provisions in all contracts for the delivery of irrigation water.[22] H.R. 9826 was reported favorably out of committee, was debated on in the House early in 1927, but was not voted upon.

On the Senate side, one of the Johnson bills, S. 3331, was also favorably reported out of committee, but a vote on this bill was blocked by a filibuster conducted by Senator Ashurst of Arizona. During the floor debates on this bill, Senator Phipps of Colorado offered two amendments which would have incorporated express

acreage limitation requirements. Neither of these amendments was adopted.

While this third set of Swing-Johnson proposals did not contain specific acreage limitations provisions, it did refer to reclamation law, making the act a "supplement to the reclamation law, which said reclamation law shall *govern* the construction, operation, and maintenance of the works * * *," the predecessor of § 14 of the Project Act. The advice of Dr. Mead and Congressman Swing in Committee, and the proffered amendments containing express acreage limitation provisions must be read in conjunction with this § 14 language in the bills, language which plaintiff now contends incorporates the acreage limitation features of § 46 of the 1926 Act. The timing of these occurrences is deserving of interest, for this was the Congress which months earlier had passed the Omnibus Adjustment Act of 1926 and would presumably be most sensitive to the possibility of incorporating § 46 acreage limitation into the Project Act by means of the language which was to become § 14.

The 70th Congress saw the introduction of the fourth Swing-Johnson bills, and at the outset one striking development is noted. While all previous Swing-Johnson bills had been identical, now Congressman Swing's bill, H.R. 5773, contained a specific acreage limitation proviso, but Senator Johnson's bill, S. 728, did not contain any such limitation.

H.R. 5773 was reported favorably and was passed by the House after brief debate. In the Senate, Senator Ashurst proposed another bill, S. 1274, which expressly included acreage limitation. The Senate committee refused to take action on this bill and likewise failed to incorporate an amendment by Senator Ashurst to S. 728 which would have added

---

20. I. e., a "new" project, in the language of the Department. And § 46 of the 1926 Omnibus Adjustment Act, upon which plaintiff relies, only relates to "new" projects or "new divisions" of old projects.

21. Hearings on H.R. 6251 and H.R. 9826 Before the House Committee on Irrigation and Reclamation, 69th Congress, pp. 32–33 (1926).

22. H.Rept. No. 1657 on H.R. 9826, 69th Cong. 2nd Sess. at pp. 29–30 (1926).

acreage limitation. S. 728 was reported out of committee with a recommendation for passage,[23] but Senate debate on the measure was again bogged down in a filibuster by the Arizona Senator. At the beginning of the second session, the Senate undertook consideration of H.R. 5773 under the floor management of Senator Johnson. Senator Hayden of Arizona had called attention to the discrepancy between the House and Senate versions in the matter of acreage limitation and proposed a corrective amendment. This amendment was not adopted. Senators Ashurst and Hayden on several occasions called attention to their rejected amendments and criticized the Senate bill for its lack of an acreage limitation applicable to private lands.[24]

The statements of Senators Phipps, Hayden and Ashurst recur too frequently and are too pointed to be disregarded. While the statements of opponents of a bill may not be authoritative, "they are nevertheless relevant and useful, especially where, as here, the proponents of the bill made no response to the opponents' criticisms." [25]

In this session, Sen. Johnson moved to substitute S. 728 for H.R. 5773 so as to retain the enacting clause of H.R. 5773 and the text of S. 728, leaving the potential Act without an express acreage limitation provision. Senator Johnson advised the Senate that H.R. 5773 contained "like purposes and like designs" and that the substitution was offered to "preserve orderly legislative procedure." Unanimous consent to the substitution was obtained.[26]

This action is puzzling no matter how you read the completed statute with regard to acreage limitation. Plaintiff contends that because there was unanimous consent, with no complaint even from Senators Ashurst and Hayden, the

Senate believed that acreage limitation was incorporated by the general references to reclamation law and that there was no real difference. However, the numerous amendments proposed and the remarks during debate clearly show that Congress did not understand the two bills to be identical. Why someone on either side of the issue did not point to this significant difference is a question which probably cannot be answered now except by speculation.

To conclude the chronology, the Senate passed this version of the bill, and the House did likewise shortly thereafter. President Coolidge signed it into law on December 21, 1928.

There remains the question of why Congress desired to exempt these lands from acreage limitations when that policy had been a cornerstone of prior reclamation law. As noted in the discussion of the plain language of the statute, Congress enacted legislation recognizing prior rights to appropriation of Colorado River water which had been established by land cultivators in the Imperial Valley. The proceedings before Congress show that it was aware of the water rights held in Imperial Valley and that provisions of §§ 1, 6, 8, and 13 of the Project Act were designed to protect these rights from charges for water delivery and to insure that rights deriving from the Colorado River Compact would be recognized.[27] The steps taken to protect these rights were accomplished in recognition of the fact that the All-American Canal Project was not merely an arid lands reclamation project, but was a special purpose program designed for national purposes, including water negotiations with Mexico, as well as for regional agricultural development.

---

23. S.Rept. 592 on S. 728, 70th Cong., 1st Sess., March 20, 1928.

24. See e. g., 69 Cong.Rec. 9451.

25. Arizona v. California, 373 U.S. 546, 583 n. 85, 83 S.Ct. 1468, 1489, 10 L.Ed. 2d 542 (1963).

26. 70 Cong.Rec. 67 (1928).

27. See, e. g., Remarks of Senator King in 70 Cong.Rec. 528; Remarks of Senator Johnson 70 Cong.Rec. 233.

## VII. ADMINISTRATIVE PRACTICE

In construing a statute, weight must be given to interpretation placed on the statute by those charged with its administration. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). See also Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964). Respect for administrative interpretation is particularly appropriate when the administrative practice involves a " 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.' Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933)." Power Reactor Development Co. v. International Union of Electrical Radio and Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961).

After consultations within the Department, Secretary Wilbur on February 24, 1933, advised the Imperial Irrigation District by letter that the acreage limitation of reclamation law did not apply to private lands in the Imperial Valley. This letter stated in pertainent parts as follows:

"Early in the negotiations connected with the All-American Canal contract the question was raised regarding whether and to what extent the 160-acre limitation is applicable to lands to be irrigated from this canal. Upon careful consideration the view was reached that this limitation does not apply to lands now cultivated and having a present water right. These lands, having already a water right, are entitled to have such vested rights recognized without regard to the acreage limitation mentioned. Congress evidently recognized that these lands had a vested right when the provision was inserted that no charge shall be made for the storage, use, or delivery of water to be furnished these areas.

In connection with the activities of the Bureau of Reclamation it has been held that the provisions of section 5 of the reclamation act restricting the sale of a right to use water for land in private ownership to not more than 160 acres will not prevent the recognition of a vested water right for a larger area, and protection of the same by allowing the continued flowage of the water covered by the right through the works constructed by the Government. (Opinion of Assistant Attorney General, 34 L.D. 351; Anna M. Wright, 40 L.D. 116). On many projects it has been the practice to recognize vested rights in single ownership in excess of 160 acres and to deliver the water necessary to satisfy such rights through works constructed by and at the expense of the Government. This is true of the Newlands project, the North Platte project, the Umatilla project, and others."

Pursuant to Article 31 of the December 1, 1932, contract, judicial proceedings for the confirmation of the contract were instituted in the California Superior Court for Imperial County, sub nom. Hewes v. All Persons. (Civil No. 15460, unreported, 1933). The United States was not named a party but was kept advised of all steps in those proceedings and furnished with copies of all pleadings and papers filed therein. There was directly raised in the pleadings the question as to whether the 160-acre limitation had application to privately owned lands within the District. At no time did the United States voice opposition to the proposition urged in the litigation that the 160-acre limitation did not apply to landholdings within the District, either by intervening in said action, appearing therein as amicus curiae or otherwise.

The decision in said cause of Hewes v. All Persons upheld the authorization for and the validity of the December, 1932 contract, as written, i. e., as being a contract which, consistently with the knowledge and intent of the parties thereto, contained no clause or provision having the effect of imposing the 160-acre limitation upon private landholdings within the District. The decision expressly held

that the acreage limitation had no application to privately owned lands within the District. At all times during the construction of the All-American Canal and thereafter, the United States was aware of the holdings of the Superior Court. During the years when the All-American Canal was being constructed, no one in the Bureau of Reclamation or Department of the Interior suggested at any time that the acreage limitation was or should be applicable to the Imperial Valley.

In 1941, B. P. King, an attorney in the Bureau of Reclamation was authorized by Commissioner of Reclamation, W. J. Bunks, under instructions of the Secretary of the Interior, Harold L. Ickes, to make a comprehensive study of the excess land law. Pursuant to these directions, a report was filed in the same year entitled "The Excess Land Provision of the Federal Reclamation Law." In the report, Mr. King gave consideration specifically to the All-American Canal. Mr. King concluded that the excess land provisions of federal reclamation law were not applicable to the Imperial Valley.

In 1942, the General Counsel for the Federal Land Banks at Berkeley raised the question as to whether the 160-acre limitation was applicable to privately owned lands within the Imperial Irrigation District, Imperial County, California. The officials of the Federal Land Bank at Berkeley were informed by the Bureau of Reclamation that the limitation did not apply to such lands.

In 1946, the Bureau of Reclamation published its "Landownership Survey on Federal Reclamation Projects." This survey reflected. no excess land acreage in the Imperial Valley.

Perhaps the most serious challenge to the administrative policy initiated by the Wilbur letter arose in 1944–1945 in connection with negotiations for a supplemental repayment contract to be entered into between the United States and the Coachella Valley County Water District. Solicitor of the Department Fowler Harper rendered an opinion[28] on May 31, 1945, stating that Section 14 of the Project Act carried into operation the acreage limitation provisions of reclamation law and that acreage limitation should be incorporated in the Coachella contract. He noted that the Wilbur letter was limited to Imperial Valley, but he criticized it on the basis that it disregarded all other excess-land provisions except section 5 of the 1902 Reclamation Act.

Following approval of the opinion by Secretary Ickes, a supplemental contract was executed on December 27, 1947, which imposed acreage limitations in the Coachella Valley. Compliance was voluntary on the part of the Coachella District, and no litigation on the issue ensued. Whether this acceptance was in recognition of the correctness of the ruling or merely reflective of the fact that there were few excess land holdings is unknown.

The Department was left in the seemingly anomalous position of enforcing acreage limitation in Coachella Valley under the Project Act while allowing excess land holdings in the Imperial Valley. It will be recalled that section 1 of the Project Act prohibits charges for the "use, storage or delivery of water * * in the Imperial or Coachella Valleys." This apparently contradictory state of affairs was called to the attention of Secretary Krug in 1948. In a letter to H. C. Hermann of the Veterans of Foreign Wars, commenting on this situation, the Secretary noted that as a technical matter the Harper opinion applied only to Coachella Valley. He further stated:

"Concerning, however, the substantive questions which relate alike to both districts, we have concluded that inasmuch as the Secretary of the Interior then charged with the administration of law construed the acreage limitation as not being applicable to lands of the Imperial Irrigation District under the facts as he then understood them, and it being clear that the

28.   71 Decisions of the Department of the Interior 496 Appendix H at p. 533.

then owners and subsequent purchasers of irrigable lands in the Imperial Irrigation District were entitled to reply upon advice from the Secretary and thus establish an economy in the district consistently with that advice, they should not now be abruptly advised that the economy of the project is to be changed under a contrary ruling of the present officer charged with the administration of the law.

*To the extent, therefore, that the actual fact situation with respect to lands and water rights may be identical in the two districts in question, and to the extent that the advice furnished in the Coachella case would otherwise be applicable in the Imperial case, we feel that we must allow that inconsistency, if such there be,* to continue. I think that you will understand the position which the Department must take in this matter in fairness to those who have relied on its action, even though that action might now be subject to valid question." (emphasis supplied)

While the Secretary based his reluctance to press the Imperial matter further on considerations of fairness to those who had long relied on the Wilbur letter, he studiously avoided conceding that an inconsistency existed because Solicitor Harper himself was not informed of the status of water rights in the two districts. In his opinion, Solicitor Harper states:

"Although the language of the letter of Secretary Willbur seems broad enough to include the Coachella Valley District lands, the letter was clearly intended only to apply to the Imperial Irrigation lands. It apparently assumes that all privately owned land in the District was under irrigation and

has a vested water right. Nothing in the files indicates whether such is the factual situation, and there is strong indication that the Coachella Valley lands are to a very large degree as yet not irrigated."

There was of course ample data then available to show that in Imperial Valley there were in excess of 400,000 acres receiving pre-project irrigation in reliance on rights to Colorado River water. The major weakness of the Harper decision as it relates to Imperial Valley is its failure to deal with this question of pre-project water rights. There was much discussion of how section 14 of the Project Act made that act a supplement to reclamation law, but no discussion of Congressional recognition of pre-existing rights under the Colorado River Compact found in sections 6, 8, and 13 of the Project Act. As has been noted in the discussion of statutory language, there is no inconsistency between a prohibition on charges for the use, storage and delivery of water and an acreage limitation provision, but there is such an inconsistency between recognizing the pre-existing rights and enforcing acreage limitation. The extent of pre-project development is the heart of the difference between the Imperial and Coachella situations, and this is why Secretary Krug's statement of what he would do if an inconsistency existed at that time does not represent serious and informed criticism of the Wilbur policy. That it was even less a rejection of that policy is evidenced, in part, by the negotiation in 1952 of a supplemental contract with the Imperial Irrigation District which made no mention of acreage limitation.[29] In Article 17 the supplemental contract reaffirmed the contract of December, 1932. Such reaffirmance expressly continued

---

29. Former Solicitor of the Department Edward Weinberg, who participated in these contract negotiations, testified that the Department had considered including an acreage limitation clause in the contract, but that this item was dropped because the Department was then preoccupied with the problem of treaty commitments to Mexico for delivery of water. Also, it was recognized that the District would not have signed a contract incorporating acreage limitation. After considering these factors, the Department was of the opinion that inclusion of acreage limitation for private lands would be "counterproductive."

in effect the 1932 covenants with reference to the satisfaction of perfected rights, the controlling effect of the Colorado River compact and the other provisions of the 1932 contract earlier mentioned herein.

On February 5, 1958, Solicitor Bennett of the Department of the Interior wrote the Solicitor General of the Department of Justice in connection with the then pending case of Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542, and the question posed by Arizona in the oral argument therein as to whether the 160-acre limitation was applicable to the lands of the Imperial Irrigation District. Solicitor Bennett stated:

"The water contract between the United States and the Imperial Irrigation District was executed December 1, 1932, some 25 years ago. The negotiations leading to the contract were lengthy and extensively in the public view. Except at the time of court confirmation, *I am not aware of any challenge as to the legality of the contract during this entire period. Water has been delivered to the lands of Imperial District pursuant to the contract since the early 1940's. I am not aware that any administrative action has been proposed or taken either by the preceding administration or by this one to recognize or enforce application of the 160-acre limitation to the lands of the Imperial Irrigation District.*

"The United States acting through the then Secretary of the Interior accepted the contract as having been confirmed and acting thereon proceeded to initiate construction of the All-American Canal and engage upon a variety of transactions in reliance upon the validity of the contract. *There must surely arise a point of time, again I believe long since past, when the contract in keeping with the terms of Article 31*

*became binding upon the United States and the District. To treat otherwise at this date could have far-reaching effect."* (emphasis supplied)

This history of the administrative practice has necessarily been selective, but a thorough review of Departmental policy has failed to disclose a departure from the interpretation initiated by Secretary Wilbur until 1964. This interpretation was followed during the incumbencies of six successor Secretaries and four Presidential administrations.[30] From time to time during the period 1933–1964, a few individual members of the Department expressed doubt as to the validity of the Wilbur opinion, but these doubts never crystallized into an official repudiation. The Supreme Court commented on a similar situation in United States v. Midwest Oil Co., 236 U.S. 459, 472–473, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915):

"It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,— even when the validity of the practice is the subject of investigation."

VIII. CONGRESSIONAL KNOWLEDGE AND APPROVAL OF THE WILBUR INTERPRETATION

The failure of Congress to revise a statute or take other affirmative action

---

**30.** Secretary Ickes under Presidents Roosevelt and Truman; Secretaries King and Chapman under President Truman; Secretaries McKay and Seaton under President Eisenhower. During his tenure under President Kennedy, Secretary Udall did not disturb the interpretation.

with respect to an administrative interpretation of a statute is often competent evidence that the interpretation is congruent with the legislative design. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933). *Cf.* Red Lion Broadcasting Co., Inc. v. Federal Communication Commission, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed. 2d 179 (1965).

Congress for more than 30 years was fully aware of the 1933 ruling and interpretation of Secretary Wilbur and of the administrative practice predicated thereon. The Imperial Valley situation in light of such interpretation and practice was called to its attention in appropriation hearings for the construction and operation of the All-American Canal, at the hearings on the Central Valley and San Luis projects and at the hearings on the Small Projects Act of 1958.

Beginning in 1943, efforts were made in Congress to exempt the Central Valley Project of California from the acreage limitation. These attempts generated a fierce debate over the basic policy of land limitation, which continued for more than three years. In the end, advocates of the 160-acre limitation were successful as regards its application to Central Valley. While the inapplicability of the acreage law to Imperial Valley was repeatedly cited to Congress, the validity of that position went unchallenged. On the contrary, the Bureau of Reclamation never flagged in its support of the Wilbur ruling. Typical is the testimony of Assistant Commissioner Warne before a Subcommittee of the Senate Commerce Committee in connection with the Omnibus Rivers and Harbors bill of 1944:

"Representative ELLIOTT: Why was the limitation lifted in the Southern part of California down in the Imperial Valley? Why was the 160-acre limitation lifted? That applied there, just the same as it did elsewhere.

"MR. WARNE: No, there was never a 160-acre limitation applied to the Imperial Valley.

"Representative ELLIOTT: It came under the same Act, the Act of 1902.

"MR. WARNE: No, I am sorry, I think you will find that the Boulder Canyon Act authorized the All-American Canal, and that the provision did not apply there except as to public lands * * *." [31]

In addition to the foregoing, copies of the Bureau of Reclamation's excess land surveys of 1946 and 1964 were filed with Congress.

At no time from 1933 to the present has Congress take any action in derogation of the propriety of the Wilbur interpretation or of the long standing administrative practice which followed it.

It has been observed that to attribute significance to the inaction of Congress is often a "shaky business." [32] In this case, however, some weight must attach to this knowing inaction. Congress would hardly have ignored the Department's failure to enforce an important provision of reclamation law. *Accord,* United States v. Gerlach Livestock Co., 339 U.S. 725, 735–736, 70 S.Ct. 955, 94 L.Ed. 1231 (1950).

The court accordingly holds that the defendant Imperial Irrigation District is not bound by the land limitation provisions of reclamation law in the delivery of Colorado River water to any of the privately owned lands within the boundaries of Imperial Irrigation Distict.

The court further holds that the land limitation provisions of reclamation law have no application to privately owned lands lying within the Imperial Irrigation District.

Counsel for defendants may present an appropriate judgment.

---

31. Hearings on H.R. 3961, before a Subcommittee of the Senate Committee on Commerce, 78th Cong., 2d Sess., Part IV, page 599 (1944).

32. Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 408–409, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1960).